**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KATHLEEN TOBIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| | ) | No. 03 C 4305 |
| v. | ) | |
| | ) | Judge John A. Nordberg |
| IRWIN MORTGAGE CORP., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In late 1998, plaintiff Kathleen Tobin was hired in an entry-level position at the Chicago branch of defendant Irwin Mortgage Corporation ("Irwin"). A few months later, she and other employees at her branch (including her supervisor) attended a two-day, company-wide meeting in Indianapolis. She alleges that, late in the evening after a night of drinking, her supervisor made a sexual advance. Although she tried to resist his advances, by saying no several times, she eventually gave in and had sexual intercourse with him in his hotel room because she feared that she would lose her job if she did not.

Plaintiff never mentioned this incident to her employer for almost three years even though, as she further alleges, her supervisor made ongoing sexual comments in the workplace, a couple of which she claims were allusions to their earlier sexual encounter. The reason for failing to come forward sooner, she again explains, is that she feared losing her job. But in late

January 2002, she somehow overcame this fear and complained to Irwin's Human Resources department about the one encounter and subsequent comments.

A week after plaintiff complained, Irwin fired the supervisor.  In May 2002, plaintiff filed an EEOC charge and then, in June 2003, filed this lawsuit asserting a single Title VII claim for sexual harassment.  During this entire time, plaintiff continued to work in her same job and experienced no more harassment.  In February 2004, after several changes had occurred in Irwin's corporate operation that affected plaintiff's job and after her branch experienced a downturn in business, plaintiff's new supervisor let her go as part of a staff reduction.  Plaintiff then filed an amended complaint adding a second claim for retaliation because she believes that the real reason she was fired was to get back at her for attending her deposition in this case, which took place the week before she was fired.  Irwin has filed a motion for summary judgment in which it argues that both claims suffer from numerous defects.

## FACTS

In October of 1998, plaintiff was 26 years old, married, and working as a bartender.  One of her customers worked at Irwin and told her she should apply for a job.  She did so and was interviewed by David Tebelman, the branch manager, who recommended that she be hired.  The recommendation was approved by Nick Vracas, the Regional Manager, and plaintiff began work as a loan officer trainee on November 9, 1998.  Her salary was $24,000 a year.  Two months into the job, she decided that she did not want to be a loan officer and was allowed to move into an operational position working on various marketing and compliance projects.

# Irwin's Anti-Harassment Policy

It is undisputed that before plaintiff began working for Irwin and continuously thereafter, Irwin has had an Anti-Harassment Policy and Complaint Procedure, which was contained in its employee handbook and also in a separate document known as the Irwin Mortgage Code of Conduct. Irwin also had a practice of giving these documents to new employees and having them sign acknowledgments confirming that they had received them. Consistent with this practice, when she started work, plaintiff signed an acknowledgment – actually two acknowledgments, one stating that she had received the Code of Conduct and another one stating that she had received the "Employee Benefits Package manual," which Irwin employees testified included a copy of the handbook. Despite signing these two acknowledgments, plaintiff testified in her deposition that she did not recall seeing the employee handbook and did not even know about the Code of Conduct.

Prior to 1998, Irwin kept the handbook in paper form at each branch office. But in 1998, it began putting it on its "intranet," which was an internal computer network available to Irwin employees including plaintiff. The company announced this change to all employees in a February 6, 1998 memo, which stated that the handbook would now be offered "primarily on Irwin Mortgage's intranet site" so that employees could access the entire handbook and print individual pages as needed.[1] Plaintiff testified that she knew, as of July 2001, that the handbook was on the intranet.[2]

---

[1]In this memo, Irwin also encouraged employees to read the handbook and sponsored a "*Yes, I have read my handbook*" contest in which the winner would receive a $50 gift certificate.

[2]Over the years, Irwin periodically made revisions to this policy and notified employees of the changes. *See* 01/06/00 Memo to employees (attaching a revised copy of the policy).

In addition the written policy, Irwin had periodic training on its anti-harassment policy. As discussed below, Irwin's president, Bob Griffith, made a presentation on this policy at the February 1999 conference. Also, in November 2002, Irwin conducted a mandatory anti-harassment training session for all employees in the Chicago branch.

## The February 1999 Conference

On February 3 and 4, 1999, plaintiff, Tebelman, other employees from the Chicago branch, and Irwin employees from different states attended a two-day company conference in Indianapolis. Plaintiff rode to the conference with Patrick Coyle, a co-worker from her branch.

On the evening of February 3rd, plaintiff, Tebelman, Coyle and several others gathered at some point in a hospitality suite at their hotel. They were drinking. Over the course of the evening, plaintiff would by her own admission consume "quite a bit" of alcohol. The group left the hotel suite and went to a dance club where they continued drinking. Later they returned to the suite and watched television, drank some more, and smoked cigarettes.

At some point, plaintiff went to the bathroom and returned to find that everyone had left except Tebelman who was sitting on one of several couches on the room.[3] After returning from the bathroom, plaintiff went to the couch on which Tebelman was sitting and sat down next to an ashtray. She was smoking. Then Tebelman began his sexual advance. In her deposition, taken five years later, plaintiff described the event as follows:

> We were watching some TV. Might have been music or MTV or something like that. It got – he was just being real friendly. I don't remember [if we were having a conversation.] I am sure we were, but I don't recall what. I remember, you know, trying to kind of scoot away. No. Stop. I was uncomfortable with it.

---

[3]Plaintiff later heard, although she did not know at the time, that Tebelman had asked at least one employee to leave the room while she was in the bathroom.

> [I told him to stop.] And he just continued to be real friendly and, you know, real sweet and talking and being very persuasive. I just remember him being real sweet and persuasive. I can't remember distinctly what he said. [] He just continued groping. And I was very uncomfortable with it. But I was trying to be polite. [He was] rubbing, touching, feeling. All over. On my back. Around my stomach. Around my chest. I believe that [he touched my breasts] a little while later. A few minutes later. I was very uncomfortable. Trying to be polite. And kind of moving around. He was trying to get his hand under my shirt. I was not real interested in it. I kept saying no, no. And he was just persuasive and persistent [i]n continuing to grope me. It just continued. Eventually I just finally gave in [b]ecause I felt as though I couldn't say no anymore. I mean, I had tried.

(Dep. 107-110.) The two then walked down the hall to Tebelman's room and had sexual intercourse.[4] Plaintiff said that she eventually stopped resisting Tebelman's advances because she was "[a]fraid of the whole situation. It was all getting out of control and I was afraid. I didn't know what to do." (*Id.* 111-12.)

At around 2:00 or 3:00 a.m., plaintiff went back to her hotel room. She immediately felt bad about the encounter. "I recall being on the elevator and feeling horrible." She was "emotionally sick," "very scared," and "shocked that it all had happened, belittled, embarrassed." She did not talk to anyone at that time about this incident because she was "too afraid, . . . too shocked, too embarrassed."

### The Second Day Of The Conference

The next day, plaintiff attended the company's presentations, which lasted until 3:00 in the afternoon. According to the agenda of the meeting and as confirmed by other witnesses, the first session in the morning addressed the topics of regulatory compliance, strategic planning, and harassment. The portion on harassment related to Irwin's anti-harassment policy and was given by the company's president. Although plaintiff could not remember in her deposition the

---

[4]Plaintiff said that she had no recollection of the event itself.

presentation on harassment, she did remember that she attended the first session because it involved a topic (regulatory compliance) that directly related to her job.  From 11:30 until noon, Katrina Crubaugh gave a presentation on behalf of the Human Resources department.   Plaintiff remembers leaving the conference when it ended at around 3:00 p.m.

### After the Conference, Plaintiff Works Full-Time Until March 2000

After the conference, plaintiff returned to her marketing and compliance position and worked full-time from 8:30 a.m. until 5:00 p.m.  In March, a month after the conference, Tebelman sent two memos to Nick Vracas seeking approval for a raise in plaintiff's salary from $24,000 to $30,000 a year.  Tebelman explained that the raise was justified because plaintiff had temporarily taken over certain marking and compliance jobs and  had "done such a fantastic job" that Tebelman wanted to make them her primary duty.  He further explained that, since she is sacrificing additional earnings as a Loan Officer, he needed to "reward her" with an increase to $30,000.  The second memo a week later stated that he needed to make the offer "in order to have her agreement."[5]

A year later, in March 2000, plaintiff was pregnant and experiencing some difficulties and wanted to work from home.  She went to Tebelman to talk about this possibility.  Tebelman, and Laura Koselke who was then the Operations Manager, approved plaintiff's request and allowed her to work from home, only coming into the office one day a week.  It was initially anticipated that this would be temporary.

---

[5]Plaintiff's employee "Information and Change Sheet," a form that was filled out when she started working (Dep. Ex. 12), states that her starting salary was $24,000 and that her next salary review date would be November 1, 1999.

On April 25, 2000, plaintiff gave birth to a boy who, as a result of problems with the delivery, had physical problems that would require full-time care. Because she wanted to provide full-time care for her son, plaintiff requested that she be allowed to continue working at home. Tebelman again granted this request. Plaintiff was the only member of the office staff who was allowed to work at home. While at home, plaintiff continued to perform all her regular duties in addition to providing full-time care for her son.

## Tebelman's Comments From 1999-2002

In the three-year period after the Indianapolis conference until late January 2002 when plaintiff finally complained about Tebelman's conduct, plaintiff says that Tebelman made "ongoing sexual comments, remarks, and overtones." (Def. Ex. 7.)[6] In fact, she said that she "always heard something each day [she] was there." She alleged that Tebelman sometimes spoke at the lunchroom table about his sexual experiences and dates that he went on. However, although plaintiff generally alleged that Tebelman made ongoing comments, she only identified the following six specific comments, which we set forth in chronological order.[7]

The first specific comment was allegedly made in August 1999 – approximately six months after the Indianapolis conference – when plaintiff told Tebelman that she was pregnant. He responded: "Whose baby is it? Mine?" (Def. Ex. 7.) Plaintiff found the comment "very offensive," although she did not believe that it was physically possible that the baby was his.

---

[6]Defendant's Exhibit 7 is plaintiff's January 28, 2002 letter in which she first explained in detail what had happened to her. In this fact section, we have relied largely on this letter, which is consistent with plaintiff's later complaint.

[7]Tebelman either denied making, or could not recall making, these comments. Of course, in considering defendant's motion for summary judgment, we take plaintiff's version of these facts as true and assume all these comments were made.

The second comment occurred in July 2000, eleven months after the first one, when plaintiff brought her son to the office. Tebelman allegedly said: "Oh, is that little David?" Plaintiff answered yes because her husband's name was David. But she was privately upset because she felt Tebelman was making a reference to their earlier encounter.

The third comment was made in December 2001, about sixteen months later. A former employee came to the office to show off her engagement ring. Tebelman allegedly expressed surprise that she that she received such a large ring and said: "I thought you don't give Blow Jobs, how did you get such a big ring?" (Ex. 7.) This comment was not directed at plaintiff but she, along with three other employees, were nearby when it was made.

The fourth comment took place on January 8, 2002. Tebelman was near plaintiff's desk when Artie Kalousek and Norm Houser asked him why he was so stressed out. Tebelman allegedly stated: "Maybe it is lack of sex, Do you think Kate would be interested in having sex with me, I doubt it." According to plaintiff, Kalousek "tried to pacify the situation by saying that I was a married woman, not to mention I was married to a big cop." Plaintiff did not respond to the comment in any way, and did not even turn around. But she later that day went on the intranet and reviewed the anti-harassment policy.

The fifth and sixth comments happened on January 22, 2002. Plaintiff described them as follows:

> I went to Dave Tebelman's office to go over some marketing emails with him. When I told him what I wanted to discuss he said "Only if they are e-mails with naked women on them." I continued to discuss the marketing and he decided that we would hold off on the postcards because he thought we might be switching companies. I inquired about that and asked if I was included in the move. I asked if I would still be needed to do marketing and databases and compliance if we were to switch. He said, "I didn't include you or not-include you." I was fearful of what he was saying about the future of my employment. He then said, "But for

some Sexual Favors I will consider keeping you on." I tried to ignore that
comment but I was very offended. He continued to tell me of the uncertainty of
my position. I tried to reinforce to [him] all of my responsibilities and duties that
my job entails but he still was uncertain of my future employment.

(Ex. 7.) Although Tebelman strongly denied making these two specific comments, he agreed

that a conversation took place and explained that he had been considering at this time switching

to another company (Platinum Mortgage) and taking some of the branch employees with him.

He said that this conversation occurred after he had returned from a meeting with Platinum.

Tebelman further testified that this conversation took place during a time when he was

feeling pressure regarding plaintiff's work-at-home arrangement. Some employees were bitter

over the fact that plaintiff "was working one day a week and getting paid for five days a week."[8]

Cargill, who was then the regional manager and supervisor above Tebelman, asked Tebelman

why he had somebody in the office working one day a week. And there was a slow down in

business as well. Tebelman testified about what was going on at the time of the January 22nd

conversation:

I remember discussing the potential movement from this company to another
company with Kate. Business at that point in time was somewhat slow. I was
being pressured by my boss and also by some of the operations people. Kate was
working out of her house. She came to the office one day a week. I did
everything in my power to try to give her opportunities that she could work out of
the branch. She was a tremendous employee.

---

[8]*See also* Tebelman Dep. 63: "[T]here was some animosity by the operations people
because anybody would say I would love to work at home four days a week." Tebelman further
testified that the animosity in part related to the fact that plaintiff had been able to do this for "as
long as she had." (*Id.*)

Tebelman offered various solutions, such as plaintiff working three days a week or working half-days. Although plaintiff agreed to talk to her husband about these options, she came back and (according to Tebelman) said that there was "no way" she could spend more time in the office.

### Plaintiff Decides To Complain About The Harassment

Plaintiff says that the Tebelman's comment on January 22nd – that he would consider keeping her on for some sexual favors – was "pretty much the straw that broke the camel's back" and pushed her to complain. She told her husband, for the first time, about the sexual encounter three years before:

> I told [my husband] what Mr. Tebelman had said about I would be included in the move to Platinum Mortgage, you know, for some sexual favors. And from there, everything else came out and I told him everything else. The ongoing sexual harassment, everything that happened in Indianapolis.

Plaintiff 's husband was very angry – both at her and at Tebelman – and immediately wanted to confront Tebelman and to exercise some self-help. But plaintiff "begged him not to" because she needed to keep the job and wanted to handle it herself. Eventually plaintiff's husband convinced her to make a complaint. On January 25, 2002, he called Human Resources on her behalf to ask about the procedure for filing a complaint. He spoke with Crubaugh who explained the procedure to him. That same day, Crubaugh spoke with plaintiff and asked her to reduce all of her complaints to writing so that an investigation could be conducted. Crubaugh shared the information she learned during the phone call with Robert Griffith, Irwin's President, and Rebecca Tolton, Irwin's in-house counsel.

On January 28, 2002, plaintiff wrote a detailed two-page letter in which she set forth the incidents described above. (Ex. 7.) After receiving the letter, Crubaugh and Tolton traveled from Indiana to the plaintiff's branch office to conduct an investigation and asked Cargill to fly

-11-

in from Phoenix to meet them. Due to bad weather and because Tebelman was out of town, the investigation was scheduled for February 4, 2002.

Crubaugh and Tolton interviewed Tebelman and asked him if he had slept with plaintiff at the conference. He did not deny that he had. At the end of that interview, Crubaugh, Tolton, Cargill and Griffith agreed that Tebelman's actions in having sex with a subordinate were inappropriate and decided to terminate him effective that day. He cleaned out his office that night and never returned. He was "flabbergasted" by the allegations plaintiff made against him and "didn't have a clue" that she had been upset by his actions. He also was surprised given that he had "tried all kinds of things" to help her: "I thought that I was doing right by Kate and her husband by creating this position for her."[9]

Cargill testified that during this general time he had learned about plaintiff's work-at-home arrangement and felt that her job functions should be handled internally in the office. He said that he would have dismissed plaintiff at that point if she had refused to come into the office. But he decided not to do so because of the "litigious society that we live in" and the fact that plaintiff had alleged discrimination. He also said that the branch was doing well enough that the lost productivity would not be apparent: "I can hide a lot of things when markets are good."

### Events After Tebelman Is Fired

After Tebelman was fired, Laura Koselke took over as interim branch manager. A few months later, she was formally promoted to branch manager. Plaintiff now reported to her instead of Tebelman.

---

[9]Tebelman testified that, after being fired, he "came close to having a nervous breakdown" and that he was affected psychologically by the incident for two years during which time he took 90 days of medical leave.

During this time, plaintiff was still working from home. Koselke recognized, as did Tebelman, that this arrangement created tension with co-workers. At the same time she, also like Tebelman, felt that plaintiff was a good worker and wanted to see if she could get plaintiff to change her work arrangement:

> Kate's a very smart girl and anything we would show her she could learn it in a heartbeat and run with it and she was a very good worker, so I could see potential that we could use her in the office, cross train her in other departments and other duties and as we got busier and busier, we could use that help.

> [The one-day-a-week arrangement] created tension in the office. If we were swamped or someone did get laid off, the other girls would have to take up the duties but Kate couldn't take up the duties because she couldn't devote more time, so it created a little more tension and I had to keep an eye on that.

In late 2003 and 2004, a number of separate changes occurred over time that affected plaintiff's job. One change was that Irwin Mortgage was taken over by Irwin Financial Group, which then decided to apply different regulations and put greater emphasis on compliance. These changes increased the quantity and nature of plaintiff's job. Some of the regulations were aimed at safeguarding financial privacy, which meant that she could not work on compliance projects from home. The volume of work also increased because plaintiff was now required to make a compliance folder for all creditor reports instead of only the 20% of them for which the branch extended a loan.

Another change related to the marketing function of plaintiff's job. Previously each branch made their own marketing flyers, but the company decided that Irwin's corporate office would handle all flyers and advertising to ensure that the materials had a uniform look and contained the necessary logos and state disclosures. Yet another change was the decision by Irwin's accounting department, made in September 2003, that all invoices were to be sent in

twice a week so that they could be paid on a more timely basis. This change meant that plaintiff had to come into the office at least twice a week to process invoices.

With these changes looming, Koselke tried several times to get plaintiff to come into the office:

> we had discussions both verbal and by email about is there any way you can come in more because this is obviously impacting you. You have to come in twice a week to do payables, and she said no, she couldn't, couldn't one of the other girls pay them the second time a week, one of the other girls in the office. There was one time when she said maybe she could have her mom help her a little bit more, but when I followed up on that, no, she couldn't come in more than one time a week.

As she did with Tebelman's requests, plaintiff rejected these efforts to reach an accommodation.

There was also a decline in Irwin's mortgage business in general and specifically at the Chicago branch. Koselke thus concluded that she had to lay off some employees. In October 2003, she laid off Dolores Kritenbrink. When things did not improve in 2004, Koselke decided that she had to make additional staff reductions and decided to eliminate plaintiff's and another employee's job. She explained why in her deposition:

> Staff reduction. Our sales had gone down dramatically from 2003. We went from where we were closing 60, 80 and 90 loans a month and they went down so I had to, you know, look at my [profit and loss]. I am accountable for my [profit and loss] and monitor the profit there and cut back on what expenses that we could, layoff where we could, do staff reductions where we could and at the same time I had this change with gradually Kate's job not really being able to be performed at home. Marketing was taken over. Accounts payable was supposed to be twice a week and she could only do it once. The compliance had increased five times from what it was, and again, that had to be in the office. You couldn't do that at home anymore. So when it came down to where am I going to make cuts, I made cuts here in one area and then I made cuts with Kate's position.

Koselke also explained the decision in a later submitted affidavit (¶ 16):

> The reasons I selected Tobin for lay off resulted from the absorption of many of her duties by the corporate office, her refusal to be in the office on a regular basis,

-14-

and her lack of cross-training in other functions. Her errors also impacted my decision.

The last sentence above – that "errors" impacted the decision – is one that is not specifically included in the deposition testimony and is a fact which (as discussed below) plaintiff believes is suspicious. In paragraph 12 of the same affidavit, Koselke described these errors:

> The quality of Tobin's work suffered as a result of her decision not to be in the office on a more frequent basis. For example, due to lack of communication, Tobin often spent inappropriate amounts of time on developing marketing materials, even after she was told that marketing was to be handled by the corporate office. In addition, Tobin was not able to order office supplies when they were needed because she was not in the office on a regular basis to be aware that supplies were low. I had frequent concerns that bills were not being submitted properly because Tobin was not in the office and, on one occasion in October 2003, Tobin failed to pay the office cell phone bill in a timely manner which resulted in all of the cellular phones given to sales people being shut off.

The issue concerning the failure to pay the cell phone bill is documented in a series of emails between plaintiff and Koselke in December 2003.

At some point, the record is not clear exactly when, Koselke concluded that she would have to let plaintiff and another employee go. She got approval from Cargill. On February 10, 2004, Koselke informed plaintiff that her job was terminated. This same day, Koselke terminated another employee.

## DISCUSSION

### I.     The 300-Day Limitations Period.

With regard to the harassment claim in Count I, Irwin first argues that all of the alleged discriminatory acts occurring before August 3, 2001 are barred because they took place more than 300 days before plaintiff filed her EEOC charge on May 20, 2002. *See Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677 (7th Cir. 2005) (a Title VII complainant in Illinois must file an

EEOC charges within 300 days of the discriminatory act). Irwin directs this argument primarily at the allegation that plaintiff was forced to have sex with Tebelman at the conference in February 1999. But the limitations bar also potentially applies to two of Tebelman's specific comments (the August 1999 and July 2000 comments about plaintiff's son) and to any general comments he made during this period.

Plaintiff argues that these acts are saved by the continuing violation doctrine because they were part of a single pattern of harassment. Irwin contends that this argument is foreclosed by *National Railroad Passenger Corp. v. Morgan*, 122 S.Ct. 2061 (2002), which holds that each discrete discriminatory act "starts a new clock." *Id.* at 2072. The rationale for applying the continuing violation is that certain acts, by themselves, may be ambiguous or insufficiently pervasive to make out a claim. As the Seventh Circuit has explained, "[i]n those cases, duration and repetition are necessary to convert merely offensive behavior into an actionable change in the plaintiff's working conditions." *Stepney v. Naperville School Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004). But where the illegal nature of the conduct is "apparent immediately," the continuing violation doctrine does not apply. *Id.*

Plaintiff's allegation of forced sex is the type of discrete act that would be immediately apparent as an act of discrimination. As Irwin states in its brief, supposedly being forced to sleep with one's boss is not an ambiguous act. And plaintiff has claimed that she was unsure about whether the sexual encounter was discriminatory. This allegation also stands apart, both temporally and substantively, from subsequent three-year period of sexual comments. These later comments were made in the office, often in front of people and sometimes not even directed at plaintiff. They were not accompanied by any physical contact and, with the exception of two

comments in January shortly before Tebelman was fired, did not involve any direct or indirect sexual invitation. Application of the 300-day rule here also makes sense as a matter of policy because both plaintiff and Tebelman had trouble recollecting what happened on the night in question.

## II.     The Affirmative Defense.

Irwin argues strongly that the one sexual encounter and ensuing comments allegedly made by Tebelman were not sufficiently pervasive or severe to constitute the type of "hellish" workplace that constitutes a hostile environment. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). It points out that Tebelman never made any sexual advances after the conference and asserts that his comments were isolated and in many cases not even directed at plaintiff. It also questions whether an employee who only comes in to work one day a week (20% of the time) could ever suffer from a hostile environment. It is true that, based solely on the six specific comments, they are not great in number and spanned a large time period with some prolonged gaps in between them. It is also true that plaintiff was not even the recipient of some of them such as the "engagement ring" comment which in no way referred to her and she just happened to be nearby. At the same time, plaintiff has also alleged that Tebelman made such comments on a daily basis. Moreover, the Seventh Circuit has held that "even one act of harassment will suffice if it is egregious." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). And the forced encounter could be viewed as such an act, and maybe the request for sexual favors on January 22nd. We need not further analyze this issue because we find that, even assuming plaintiff suffered a hostile environment, Irwin qualifies for the *Ellerth/Faragher*

affirmative defense. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

Irwin may not rely on this defense if plaintiff suffered a "tangible employment action" as a result of the harassment. *Cerros v. Steel Technologies, Inc.*, 398 F.3d 944, 951 (7th Cir. 2005). Irwin also may not rely on the defense if the harassing employee is a "proxy employee" who is sufficiently high up in the corporation that he speaks for it. *Faragher*, 524 U.S. at 789. Assuming these two qualifications have been met, Irwin must then establish two elements: (i) that it exercised reasonable care to prevent and correct promptly the harassment and (ii) that plaintiff failed to take advantage of the preventative and corrective opportunities it provided. *Cerros*, 398 F.3d at 952. Plaintiff argues that Irwin cannot meet either the two qualifications or two elements.

### A. Tangible Employment Action.

A tangible employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth*, 524 U.S. at 761. It is undisputed that Irwin never took any of these actions. Plaintiff was not fired by Tebelman, nor demoted, nor reassigned. While conceding this point, plaintiff argues that "succumbing to [a] threat" that she would lose her job should be treated functionally the same as one of these actions because otherwise she would be treated differently than one who resisted the threat and was fired. Plaintiff asks that we follow *Jin v. Metropolitan Life*, 310 F.3d 84 (2nd Cir. 2002) where the Second Circuit relied on this theory. We are not persuaded that *Jin* is applicable here.

First, as an initial matter, this argument only applies to her allegation of forced sex at the Indianapolis conference, which is an allegation that we have already found is not actionable under the separate ground that it is barred under the 300-day rule.

Second, plaintiff has not cited to any case, nor have we found one, where the Seventh Circuit has endorsed this approach. Moreover, we agree with the explanation and conclusions of Judge Brown in his concurring opinion in *Lutkewitte v. Gonzales*, 436 F.3d 248, 268 (D.C. Cir. 2006), who concluded after a careful analysis that *Jin* was contrary to Supreme Court precedents. *Jin* not only relied on a pre-*Faragher/Ellerth* case but it also rested on a misunderstanding of the purpose of this requirement. The reason for requiring a tangible act – as later clarified by the Supreme Court in *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004) – is that an act such as firing, demotion, or reassignment is observable by those higher up in the supervisory chain and thus "'likely to be brought home to the employer' in the sense that the employer is on notice that its authority is being exercised," thereby giving the company the opportunity to monitor that act and ensure that it is valid rather than discriminatory. 436 F.3d at 268 (quoting *Suders*). By contrast, in a submission case, where the supervisor never carries out the threat because the employee acquiesces in the request, there is no affirmative act for the employer to observe. *Id.* at 270 ("The employer has no way of knowing that its delegated authority has been brandished in such a way as to coerce sexual submission."). Judge Brown further emphasized that a conclusion that no tangible act occurred does not mean that there was no harassment in the first place nor does it absolve the employer – it merely means that the employer is "given the opportunity" to try to establish the affirmative defense. *Id.* Here, plaintiff has presented no evidence that Irwin was aware of Tebelman's actions.

Third, the facts in *Jin* are far more compelling. The plaintiff there alleged that her supervisor made explicit, violent, and ongoing threats that she would lose her job if she did not engage in sex with him "in weekly Thursday night private meetings in his locked office." His conduct included the following:

> (a) making numerous crude sexual remarks to her, both in the office and by calling her at home; (b) offensively touching Jin's buttocks, breasts, and legs on numerous occasions at the office, including when she was making sales calls at her desk and walking clients to the elevator; (c) requiring Jin, beginning in the summer of 1993, to attend weekly Thursday night private meetings in his locked office during which he would threaten her with a baseball bat, kiss, lick, bite and fondle her, attempt to undress her, physically force her to unzip his pants and fondle him, push against her with his penis exposed, and ejaculate on her; and (d) repeatedly threatening to fire Jin if she did not accede to his sexual demands, as well as threatening her with physical harm.

310 F.3d at 88-89.

By contrast here, plaintiff alleges that her supervisor forced her to have sex on one occasion, at an out of town conference after both of them had been drinking heavily, and that he did so by being "real friendly," "real sweet," and "very persuasive," and by continuing to pursue her after she politely said no several times and scooted away. He never made any explicit threats, nor even any comment that could be arguably construed as a threat. Nor was plaintiff aware of any other facts – such as a history of threatening other subordinates – that would suggest that he might retaliate. Plaintiff's claim is thus based solely on her own assumption that Tebelman, because he was a supervisor, would use that authority to fire her if she didn't have sex with him.

Moreover, unlike *Jin*, which involved repeated sexual encounters, this was a one-time event. After this encounter, Tebelman never directly mentioned the fact that they had sex; never made any threat that she should keep silent; and never again attempted to have sex with her – at

least until the one comment the week before he was fired. And plaintiff never suffered any negative job repercussions. In fact, if anything, the evidence suggests that Tebelman may have treated plaintiff more favorably after the harassment. A month after the encounter, Tebelman lobbied for plaintiff to receive a generous 25% raise only four months into the job and described her as an excellent employee. Later, he allowed her to work at home and continued to let her do so for an extended period despite the fact that other employees were bothered by what they perceived was a favorable arrangement (plaintiff was the only employee working at home) and despite the fact that his supervisor was pressuring him to make her come to the office full-time. Tebelman tried to do everything in his power to try to convince her to change. But she still said no, and he took no action.

### B. Was Tebelman A Proxy Employee?

Plaintiff also argues that the affirmative defense is unavailable because Tebelman was a proxy employee who spoke for the corporation. In *Faragher*, the Supreme Court stated that the defense does not apply when the harassing supervisor is "indisputably within that class of an employer organization's officials who may be treated as the organization's proxy." 524 U.S. at 789. The Court noted that proxy employees include a president, owner, proprietor, partner, corporate office, or supervisor holding sufficiently high position in the management hierarchy of the company for his actions to be imputed automatically to the employer. *Id.* 789-90.

Plaintiff argues that Tebelman met this standard because he was a branch manager of two branches of Irwin; he had a "pretty much independent branch;" the processing staff reported to him; he was in charge of hiring and training the loan originators; the mortgage closers worked

for him; he had allegedly had "carte blanche" authority to hire; and that everybody in the branch reported to him.

Plaintiff has cited to no cases (other than *Faragher*) to support her argument. She also does not mention that the Seventh Circuit in *Johnson v. West*, 218 F.3d 725 (7th Cir. 2000), a case plaintiff cited elsewhere in her brief, rejected this argument as applied to the Chief of Police of a VA hospital who had been accused of harassment by his secretary. *Id.* at 730. Even though the Chief had an important title, he was not a proxy employee according to the Seventh Circuit because he "had no less than two supervisors [] within the hospital and no doubt others within the VA's bureaucracy." *Id.* The Seventh Circuit further noted that, "[i]f automatic vicarious liability is warranted for [the Chief of Police], there would be little or nothing left of the affirmative defense the Supreme Court took care to fashion in *Ellerth* and *Faragher*." *Id.*

Similarly here, it is undisputed that Tebelman was not a president, owner, partner, or any of the other positions mentioned in *Faragher*. He also did not fall within the general category of an employee with a high position in the management hierarchy. Irwin's central office, where its management employees worked, was in Indianapolis. Tebelman worked in Chicago. Tebelman was one of approximately 100 branch managers employed by Irwin. He reported to Cargill who in turn reported to others higher up. Although Tebelman undoubtedly had some influence over hiring and firing in his branch, he did not have final authority over these decisions as is shown by the fact that his decision to hire plaintiff had to be approved by the regional manager.

### C.    The First Element Of The Affirmative Defense.

We now turn to the first element of the affirmative defense. It has two parts. First, did Irwin have an anti-harassment policy designed to prevent harassment and was this policy

effectively communicated to its employees?  Second, did it take prompt action to correct the harassment?  Under the undisputed facts, the answer to both questions is yes.

### 1.	Preventing The Harassment.

The Seventh Circuit has held that an employer meets the first part if it had a detailed anti-harassment policy that was distributed to employees.  *See Shaw v. Autozone, Inc.*, 180 F.3d 806, 811-12 (7th Cir. 1999) ("[E]xistence of an appropriate anti-harassment policy will often satisfy this first prong.").

As set forth above, the undisputed facts establish that Irwin had an anti-harassment policy that was distributed in numerous ways to employees.  It was available on the company's intranet since 1998, a fact plaintiff knew about at least since at least July 2001.  When plaintiff was considering coming forward to complain about the harassment in January 2002, she knew to check the internet.  The company also made presentations on the policy, including at the Indianapolis conference, and periodically sent out company-wide memos referring to the policy. There was a separate Human Resources department.  These facts thus establish that the policy was known and available to employees.  This policy was also detailed, a point plaintiff does not even dispute, and encouraged employees to come forward to complain about harassment and indicated that any complaints would be investigated thoroughly, confidentially, and with no repercussions to the employee.  This is sufficient.  *See Shaw*, 180 F.3d at 811-12.

Plaintiff raises a few minor, but unconvincing, arguments designed to undermine this conclusion.  First, she says that she cannot recall seeing the policy.  But as noted above, she signed two acknowledgments that demonstrate the opposite.  In *Shaw*, the Seventh Circuit rejected this same argument, holding that an employee need only have "constructive knowledge"

and that it is therefore irrelevant that she could not recall seeing the policy. *Id.* at 811. Second, plaintiff complains that Irwin has not produced the "exact version" of the policy in effect in 1998. This argument exalts form over substance. It is undisputed that plaintiff was given the policy in 1998 and that it has been roughly the same policy subject to periodic minor changes. And Irwin explained that it could not produce the exact version because the policy has been kept on the intranet since 1998 rather than in paper format. Third, plaintiff states that she looked for a copy of the handbook in her branch in 2003 but could not find it. But this is not any big surprise given that Irwin announced several years earlier in a company-wide memo that it had decided to keep the handbook on the intranet rather than paper form.

### 2. Correcting The Harassment.

The Seventh Circuit has recognized "prompt investigation [] as a hallmark of reasonable corrective action." *Cerros*, 398 F.3d at 954. In this case, it is hard to see how Irwin failed to meet that standard as it took swift and decisive action once it learned from plaintiff in late January 2002 about the harassment.[10] After receiving plaintiff's harassment complaint, Irwin told her to stay at home and then sent high level individuals, including his president, to interview Tebelman. Cargill flew in specially from Arizona for the investigation. Several people interviewed Tebelman and he was fired that same day. This is sufficient under the case law. *See McPherson v. City of Waukegan*, 379 F.3d 430, 441 (7th Cir. 2004) (affirming summary judgment to employer: "As soon as it learned that Copenharve had sexually harassed McPherson, the City acted immediately to investigate, correct and prevent future recurrences of

---

[10]Plaintiff has not presented any evidence that anyone in management knew about Tebelman's harassment until she complained.

Copenharve's behavior. The City met its burden with respect to the first element of the affirmative defense.").

Conceding as she must that the investigation was prompt, plaintiff argues that it was not thorough enough, even calling it "shoddy" and "extremely deficient." We are not sure why she would even care about the thoroughness of the investigation given that the harassing supervisor was fired. She says that one of the people investigating the claim (Crubaugh) couldn't remember at her deposition two and a half years later certain details about exactly how she conducted the investigation – for example, what specific questions she asked Tebelman or the name of the other person she interviewed. Even assuming that these are something more than simply failures of memory, they are extremely minor and insufficient as a matter of law to establish that the investigation was deficient. If these types of nitpicking complaints were enough, almost any investigation could be labeled as deficient after the fact.

### D. The Second Element Of The Affirmative Defense.

It would seem to be clear-cut that waiting *three years* to tell your employer that your supervisor forced you to have sex is an unreasonable delay. While plaintiff concedes that the delay is lengthy, she believes that it was not unreasonable because she was afraid that she would lose her job if she came forward. To support this position, she relies on an unreported district court decision from another circuit. *Hawk v. Americold Logistics*, 2003 WL 929221, *9-10 (E.D. Pa. Mar. 6, 2003) (holding that a jury question existed when a temporary employee waited eight months to come forward). The Seventh Circuit, however, has held that a generalized fear that an employer would not take action or that the plaintiff would lose her job or that she would feel embarrassed are not – standing alone – valid reasons for not complaining. *See, e.g., Cooper-*

*Schut v. Visteon Automotive Systems*, 361 F.3d 421, 429 (7th Cir. 2004) ("Case law illustrates that an employee has not acted reasonably if she *assumes* the employer will fail to protect her without allowing the employer a chance to try") (emphasis added); *Durkin v. City of Chicago*, 341 F.3d 606, 612 (7th Cir. 2003) ("feelings of futility or unpleasantness do not alleviate [plaintiff's] duty to bring her mistreatment to [her employer's] attention"); *Shaw*, 180 F.3d at 813 ("an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment").[11]

Here, not only did plaintiff not come forward to complain after she allegedly was forced to have sex with her supervisor and after she was forced to listen to harassing comments allegedly almost every day she came to work, she apparently never informed Tebelman directly that she found any of his comments to be offensive. *See Shaw*, 180 F.3d at 813 (noting that the plaintiff "did not even tell [her supervisor] to stop making the offensive comments"). Given the severity of her allegations and given the conspicuous anti-harassment policy at the company, why did she not come forward sooner? Her only answer is her general claim that she was afraid of losing her job. If so, what made her finally overcome that fear in January 2002?

One possible explanation is that she had some sort of revelation, perhaps a moment of inspiration, that emboldened her to overcome a long-standing fear. But she has not offered any such explanation, and it is unlikely whether it would suffice under the case law because it would

---

[11]In *Johnson*, however, the Seventh Circuit held that a fact issue was present when an employee waited nearly a year to report the harassment but this holding was based on the allegation that her supervisor had "threatened [her], verbally abused her, and even threw mail in her face." 218 F.3d at 732. In contrast here, plaintiff has not alleged that Tebelman or anyone else made anything closely resembling a threat.

effectively give a plaintiff an open-ended amount of time to come forward. Plaintiff seems to suggest – again we are not entirely sure – that it may have been the increasing frequency and explicitness of the comments in January 2002 that caused her to come forward. While this may explain why she only then came forward to complain about the *comments*, it would not explain why she failed to complain sooner about the *forced sex*, a far more serious allegation. Moreover, as Irwin has noted in its brief, plaintiff's claim that she felt threatened by these comment is somewhat inconsistent with the fact that, during this general period, she was lobbying to get Tebelman to *take her with him* if he moved to Platinum. In any event, under any of these possible explanations, we find that plaintiff's fear of losing her job is not a valid excuse as a matter of law for waiting three years to come forward.[12]

## III.    The Retaliation Claim

Plaintiff has made no attempt to rely on the indirect burden-shifting method of proof but instead proceeds under the direct method. Under this method, she may either rely on "an admission of intentional discrimination or a 'mosaic' of circumstantial evidence that directly points to a discriminatory intent." *Davis v. Con-Way Transp. Central Express*, 368 F.3d 776, 786 (7th Cir. 2004). Plaintiff concedes that she has no direct admissions and therefore attempts to present a mosaic of circumstantial evidence. Her main two arguments are that the timing of the decision was suspicious and the explanation was inconsistent.

---

[12]We note that a lengthy delay in coming forward to report harassment creates a potential problem in a case where, as is suggested by the facts here, the plaintiff was being treated more favorably by the supervisor after the harassment. In such a case, the plaintiff might have an incentive to keep quiet about the harassment as long as she was receiving the benefit. Because this is a motion for summary judgment, however, we must assume the version of the facts most favorable to plaintiff and thus must assume that her work-at-home arrangement and 25% pay raise were not related to the harassment.

Plaintiff believes that there is a close and suspicious temporal connection between the protected activity and her firing. It is important to understand her argument. She is asserting that Irwin retaliated against her because she *gave a deposition* on February 3, 2004 and not that she was retaliated against because she filed the EEOC charge or the complaint in this case. Although this theory does have the virtue of allowing her to assert that there was a close temporal connection of only one week, a connection that would otherwise be lacking, it brings with it two major problems.

First, as a factual matter, plaintiff has not provided any evidence that the decisionmakers, Koselke or Cargill, even knew that plaintiff had given a deposition a week before she was fired. Both individuals testified that they did not know about it. Plaintiff's only evidence to the contrary is the fact that Koselke testified in her deposition that (at some unspecified point in time) she discussed the issue of plaintiff's firing with Cargill who then "referred [her] to human resources and to our legal counsel." Plaintiff then points out that Tolton was the legal counsel and that Tolton attended plaintiff's deposition. Plaintiff thus surmises that, given that Cargill told Koselke to talk to Tolton, that she in fact must have spoke to her, that the conversation must have taken place <u>after</u> February 3rd, and finally that Tolton must have mentioned in that conversation that plaintiff had been deposed a few days before. This evidence is speculative and insufficient to undermine Koselke's direct testimony to the contrary.

Second, even if plaintiff could establish this factual predicate, her theory suffers from a broader problem. She has not articulated any coherent theory for why anyone at Irwin would have been mad at her for giving a deposition after she had already filed an EEOC charge a year and a half earlier. Why would anyone at Irwin be upset or surprised by the fact that plaintiff

testified in a deposition?  In almost every discrimination case that survives a motion to dismiss, the plaintiff is deposed and then goes on in that deposition to affirm the allegations made in the complaint.  That is essentially what plaintiff did here.  There were no surprises in her deposition.

This is not a case where a company retaliates against a current employee for testifying in a way that is interpreted as being favorable to another employee's discrimination claim.  *See, e.g., Jute v. Hamilton Sundstrand Corp.*, 420 F.2d 166, 175 (2d Cir. 2005) (employee saved up vacation days so she would be "immediately available" for a deposition in her co-worker's discrimination case).  In such cases, the motivational theory underlying the retaliation is understandable.  The company might have an expectation (reasonable or not) that the employee would somehow be more loyal to the company.  Plaintiff's theory lacks any such rationale.  We are not aware of any cases – and plaintiff has cited none – where a plaintiff brought a retaliation claim based on the theory that her employer was upset at her for simply attending the deposition in her own case, a deposition that presumably was noticed up by the employer and not her.

In particular, why would Koselke, the primary decisionmaker, have been mad at plaintiff?  After all, the upshot of plaintiff's finally coming forward to complain about Tebelman was that he was fired and that Koselke *was promoted* to branch manager.  There is no evidence to suggest that Koselke displayed any animus toward plaintiff.  In fact, Koselke said in her deposition that plaintiff was an excellent employee who only needed to come to the office more, which Koselke tried several times to get her to do so that she would not be laid off.  In short, plaintiff's novel timing argument is factually and theoretically ungrounded.

Plaintiff's other main argument is that Koselke gave an inconsistent explanation why plaintiff was fired by first stating in her deposition that plaintiff was fired in a "staff reduction"

and then later adding in an affidavit that plaintiff was also fired because she was not performing adequately and failed to pay an Irwin cell phone bill on time. Having reviewed Koselke's deposition testimony and affidavit, we cannot find any contradiction.

Contrary to plaintiff's suggestion, there is nothing inherently incompatible with these two explanations as they can easily co-exist. If a company must make staff reductions, it makes sense to first lay off employees whose performances are viewed as less than adequate. Moreover, plaintiff's argument rests on a selective reading of Koselke's deposition testimony. In her statement of additional facts (Nos. 64-65), plaintiff only quotes the first and last parts of Koselke's deposition answer (Dep. 28 lines 13-22 and Dep. 29 lines 9-12) where she stated that she laid off plaintiff in a staff reduction due to a dramatic decline in sales. However, plaintiff fails to quote the middle portion of her answer (Dep. 29 lines 1-8) where Koselke further explained that she chose let plaintiff go for the same basic reasons set forth in the affidavit – namely, the corporate changes that made it impossible for plaintiff to work from home.[13]

Finally, plaintiff has offered no evidence that would cast doubt on the reasons Irwin gave for laying her off. She has not attempted to dispute that Irwin went through several corporate changes that effected her job; that other employees were upset that she was allowed to work at home; that she was the only employee given this benefit; that Irwin had a drop in sales; and that

---

[13]As for the cell phone dispute described in the affidavit, it is also consistent with the deposition testimony (even though it was not specifically mentioned there) because Koselke explained in her affidavit that this dispute arose due to a mis-communication from the fact that plaintiff worked from home. While plaintiff claims she did nothing wrong, she has admitted that she was partially at fault. And based on the exchange of emails supplied to the Court, there is no evidence that this was anything more than an honest disagreement between a supervisor and subordinate. Moreover, it was not touted in Koselke's affidavit as being a significant part of her decision, but merely one example of the larger problem mentioned in her deposition.

Koselke had to let some employees go.  These facts were testified to by numerous witnesses. Although they are facts that could be refuted fairly easily if they were untrue, plaintiff has not attempted to refute any of them.  In sum, plaintiff has offered no evidence to refute the assertion – one that accords with common sense – that her work-at-home arrangement caused both co-worker resentment and problems in communication and that her job was therefore a good one to eliminate in a staff reduction.

## CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted, and judgment is granted to defendant on all counts.

**ENTER:**

_____
**JOHN A. NORDBERG**
**Senior United States District Court Judge**

**DATED:** March 31, 2006